BETTY J. FICK, ADMINISTRATRIX OF THE ESTATE OF THOMAS FICK, DECEASED, APPELLEE, v. MABEL C. HERMAN, DOING BUSINESS AS HERMAN OIL TRANSPORT COMPANY, ET AL., APPELLANTS, IMPLEADED WITH EDGAR CLIFTON, APPELLEE.

68 N. W. 2d 622

Filed February 18, 1955. No. 33591.

*Wear & Boland, M. D. Cook,* and *John E. North,* for appellants.

*Sidner, Lee, Gunderson & Svoboda,* for appellee Fick.

*Spear, Lamme & Simmons,* for appellee Clifton.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought in the district court for Dodge County by Betty J. Fick, administratrix of

the estate of Thomas Fick, deceased, to recover damages for the wrongful death of Thomas Fick caused by a collision between an automobile driven by the defendant Edgar Clifton, in which Thomas Fick was a passenger, and a stalled truck owned by the defendant Mabel C. Herman, doing business as the Herman Oil Transport Company, and Marvin G. Melia, the driver of the truck. The case was tried to a jury resulting in a verdict in favor of the plaintiff and against the defendants Mabel C. Herman and Marvin G. Melia, fixing the amount of the plaintiff's recovery in the sum of $18,000, and finding the plaintiff not entitled to recover against the defendant Edgar Clifton. Judgment was rendered on the verdict. The defendants Mabel C. Herman, doing business as the Herman Oil Transport Company, and Marvin G. Melia filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, which was overruled. The defendants Mabel C. Herman, doing business as the Herman Oil Transport Company, and Marvin G. Melia perfected appeal to this court.

The defendant Mabel C. Herman, doing business as the Herman Oil Transport Company, will hereinafter be referred to as the company, and the defendant Marvin G. Melia will hereafter be referred to as Melia or the driver of the company truck.

There is in evidence a map covering an area of 2,700 feet between Ashland and Greenwood which shows U. S. Highway No. 6, the shoulders on each side thereof which are 10 feet in width and very uniform along the north side of the highway, two side roads, and also station numbers 100 feet apart. This is a paved highway which was completed in June 1952, and is 24 feet in width. The elevation at the top of a hill which is toward the east, that is toward Ashland, is 1,112 feet above sea level. At a bridge which is at station No. 727, the elevation is 1,093 feet, and at the middle station the elevation is 1,097.1 feet. This highway runs north-

east and southwest. The greatest slope occurs between stations 740 and 733, at which point it is approximately 2 feet per 100, a moderate slope or a 2 percent grade. For some distance east and west on this highway to the point where the accident occurred, the highway is rather straight, without curves or obstructions.

The record discloses that Melia, who had been employed by the company for about 2 weeks, reported at its terminal in Omaha at 2 a. m., February 9, 1953. He was a student driver and that day worked with Don Wilson, a regular driver for the company. Both drivers were experienced in handling commercial trucks in interstate commerce. They picked up a transport consisting of an International KB-8 tractor and a Fruehauf tank trailer used for transporting gasoline in interstate commerce. They left the terminal at 2:15 or 2:20 a. m., for Council Bluffs, Iowa, to go to the Standard Oil pipe line station where they arrived at about 2:45 a. m. Wilson drove the transport to Council Bluffs. Arriving at the Standard Oil pipe line station they gave an order to the man in charge. At that time they checked the valves and waited for the order to be filled. This load consisted of 5,830 gallons of gasoline, and it took from 20 to 30 minutes to fill the tanks. The transport had not been checked for gas and oil at the terminal as was customary. It appears in a pamphlet of the company that the preceding driver who brought the transport in was charged with that duty. There were no fuel gauges on the dashboard of the tractor indicating the fuel available to operate the transport. The cargo tank was sealed as required by law. They signed the bill receipting for the gasoline and proceeded, with Wilson driving, back to Nebraska to the port of entry where they obtained clearance papers showing the amount of gasoline being transported into Nebraska for tax purposes. They left the port of entry, with Melia driving, at about 3:30 a. m., finally arriving on U. S. Highway No. 6 proceeding southwest to Lincoln. The destination of the

cargo was Cortland. Shortly after passing through Ashland, while driving at a speed of 30 to 35 miles an hour over the crest of a hill, Melia encountered engine trouble which indicated by the sound that one of the saddle tanks was out of gas. He immediately reached down and turned the selector valve, thinking there was gas in the other tank. He let the truck roll in gear with the idea that it would draw fuel from such tank into the carburetor. He stopped the transport 4 or 5 inches from the right edge of the pavement, as close thereto as he could get. He described the transport as having headlights, parking lights, and at the top of the cab orange or amber lights, three lights over the cab which were amber, and lights on each side of the tank approximately in the center thereof, which would show amber forward and red to the rear. At the rear of the truck, at the circle of the tank, there were two clusters of three lights on the right side and on the left side, and below the bumper there were two taillights 3 inches by 7 inches. The cluster lights were red, the taillights red, the stop light yellow or black, and the word "stop" would show up in yellow lettering. The tractor was red with a white tank, and the rear bumper painted black with white stripes similar to any barricade.

When Melia stopped the truck he put on the emergency brake and put the truck into first gear. He shut off the headlights and left the parking lights on, also the taillights which were 3 inches in diameter and colored red. The lights on the side of the tractor and the back end remained on, as they were on a separate switch. The two drivers got out of the truck and proceeded to set out flares which were new and met legal requirements. One flare was set behind and to the side of the left rear wheel of the tandem. It was to the north of the center line of the highway. Another flare was placed at a point 100 feet or more east of the truck on the north edge of the pavement. The base of the flare was placed parallel to the highway so that it could be

seen from either direction. When the headlights of an approaching automobile struck the reflectors there would be a red glow. Wilson set one flare to the west, practically the same number of feet, 100 feet or so, ahead of the truck on the south side of the highway on the pavement so it could be seen from either direction. They arrived at this point about 5 a. m., and it was dark. They then checked the saddle tanks to make sure they were out of gas, and found that they were. The truck stopped 1.9 miles east of Greenwood. Melia did not turn off of the highway because the shoulder was muddy and he did not want to mire the truck which weighed 57,403 pounds. He further testified that he and Wilson got back into the cab of the truck. They could see by two rear mirrors cars approaching from the rear of the truck, and could also see cars approaching from the front thereof. They saw a car coming and blinked their lights, but the car did not stop. A few minutes after this car left, a truck approached from the east. They started blinking the clearance lights. The truck pulled up beside them and stopped. The truck was proceeding west. Wilson caught a ride with the driver of this truck for the purpose of obtaining gasoline. After Wilson left, Melia stayed in the truck and when traffic came along he would blink his clearance lights as a warning. The clearance lights along the truck were burning. About 20 minutes after Wilson left, Melia checked the clearance lights and wiped them off with a small rag which he kept in the glove compartment. There was dirt on the back of the truck. The amount of dirt, and whether or not it obscured the lettering on the back of the truck, is in dispute. Melia climbed back into the cab and as traffic approached from either direction he would blink his lights to give warning as to the position of the truck along the highway. He estimated that between 50 and 75 vehicles passed without mishap.

Clayton Etmund, a farmer-trucker, testified that he was taking a load of cattle to Omaha. He came upon

the Herman transport parked along the highway at 5 or 5:15 a. m. He first noted the lights of the truck blinking. It was dark, and there was no fog. He observed the reflector flare on the shoulder of the highway next to the pavement 100 feet or more west of the truck. There was also a flare along side of the truck. The truck's clearance lights and travel lights were on. He did not stop, but saw a flare after he had passed the truck. He first saw the lights on the truck as he came over a rise on the pavement about a couple of blocks distant. He believed that the lights of his truck would show 3 blocks. He did not see the east side of the flares.

Alva L. Smith testified that he was driving a truck load of cattle to South Omaha. As he left Greenwood shortly before 6 a. m., he was driving about 45 miles an hour. He saw the oil transport when he was about 500 feet from it, by noticing the clearance lights and the cluster of lights blinking. He saw the outline of the truck when he was 100 or 150 feet from it. He observed a reflector flare on the right side of the pavement as he was proceeding east. It was close to 100 feet in front of the truck. He did not stop, but slowed down to 20 or 25 miles an hour. After he passed the truck he looked through his rear-view mirror and could see the back end of the truck which had red lights on the rear and each side thereof up to the top in a cluster. It was dark; there was no fog; and it was shortly before 6 a. m., when he arrived at this point. He noticed other flares, one behind the truck on his left at the edge of the pavement about 100 feet east of the back end of the truck. He did not see any flare right by the oil truck.

Don Daniel testified that he was driving an oil transport for the F and M Oil Corporation. When he came over the rise in the road he saw clearance lights and flares. The lights were blinking. This was about 6:15 a. m. It was dark. He noticed a flare along the side of the truck and one in front of it. He stopped. The clearance lights were on and the cab lights were on.

He asked the driver if he needed help. The fuel tanks on his truck had some gas, but the driver did not ask for any gas.

A general foreman for the Wood Crafts, Inc., of Lincoln, Nebraska, was traveling from his home in the vicinity of Ashland to his place of work. He left his home at 6:10 a. m., and arrived at the point where the Herman transport was stalled at about 6:25 a. m. It was dark, the weather was clear, and the pavement dry. When he reached the vicinity of the bridge he saw the lights blinking on the transport. There was a car ahead of him which went around the transport, and he slowed down. The lights of the transport were a "dirty red." He recalled seeing two reflector flares, one in the middle of the pavement on the side of the truck and one on the right side of the highway back of the transport. He was unable to approximate distances. He testified that the back end of the transport was dirty.

Edgar Clifton testified that he was employed by the Burlington Railroad; that on February 9, 1953, he was working the 7:30 a. m. to 4 p. m. shift at the Havelock shops in east Lincoln; that he left his home in Ashland for work, driving a 1936 Ford coach; that at approximately 6:30 a. m., he picked up a fellow employe, Thomas Fick, in the east part of Ashland. He and Fick had an agreement that they would provide transportation every other day to Greenwood, and they had an agreement with a party in Greenwood that each would provide transportation every third day from Greenwood to Lincoln. On the way from Ashland to Greenwood he, with his passenger Fick sitting beside him to the right, proceeded at a speed of 50 miles an hour. It was dark and there was fog in places. When he reached the bottom of the slope southwest of Station 742 on U. S. Highway No. 6 near Ashland, a big freight truck blinked its lights to go around the automobile of this witness. He slowed his speed to 40 miles an hour. The freight truck did not interfere with his driving, except that it kicked up a

little dust and then disappeared out of sight on account of the fog. A few seconds after this truck had gone around him, he was driving along and all at once there was a "bang" and he did not know what he had hit. He had his lights on dim, and they would throw a beam about 300 feet. He did not see any flares, any lights, or the object that he hit.

Melia testified that as he sat in the cab of the transport he was able to see traffic from behind by glancing in the rear-view mirror; and that he saw the Clifton car coming over the break of the hill behind him and started blinking his clearance lights by pushing the dashboard switch in and pulling it out continuously. The Clifton car did not slacken its speed nor turn to the left, but come straight ahead and hit the transport. The force of the impact moved the transport, with the brakes set, about a foot forward. The heavy steel torsion arms which fasten the left rear tandems to the frame of the tank trailer were broken off, and the front end of the 1936 Ford was completely mashed in.

A driver for Union Freightways testified that he stopped on the highway about 6:30 or quarter till 7 a. m., when he was attracted by the rear lights and clearance lights of the transport blinking. He observed reflector flares, the first of which was 100 feet to the rear of the trailer on the right side of the pavement near its edge. He saw a flare near the center line to the rear of the trailer. He pulled his semi-trailer cargo van around the transport. As he did so, he saw a flare on the south side of the road approximately 100 feet ahead of the truck. He pulled up and stopped about 100 feet ahead of the transport. He had no difficulty in passing the transport. He got out and went back and asked the driver if he could help. Melia did not ask him for gas. This witness testified that his truck was equipped with safety tanks, saddle tanks that you cannot get the gas out of. There was no seat tank. He saw the Clifton car

jammed into the transport. The lights on the transport were left burning.

Another driver for the same company arrived at the scene of the accident between 6:30 and quarter till 7 a. m., and was the second vehicle to stop there. He first saw the rear clearance lights of the transport when he was from an eighth to a quarter of a mile away. He then saw a man waving a flashlight. He started slowing down, and saw a reflector flare 75 to 100 feet behind the transport. He parked his truck and helped flag traffic on both sides of the highway.

A chief inspector of the safety division of the Department of Labor of the State of Nebraska, testified that he arrived at the scene of the accident at approximately 6:30 a. m. West of Ashland he saw a dark object in the reflection of his own lights. He saw no lights on this object. When he got closer, he saw an accident involving an old car and a gasoline transport. There was no activity in the vicinity, and no other vehicles, trucks, or ambulances were there. He did not stop. He saw no reflector flares close to the old car and gasoline transport.

William Mason, an electrician and lineman employed in Lincoln, left his home in Ashland to go to Lincoln. He had the lights on his car turned on. It was about 6:45 a. m. He saw a man on the highway flagging traffic with a flashlight. He saw no flares back any distance from the transport. He came to a stop 100 feet from the oil transport, behind the Clifton car. He went to the scene of the accident. There was an ambulance there and he helped take Fick out of the Clifton car and load him in the ambulance. He further testified that his car was the first car parked back of the Clifton car and others arrived thereafter; that it was just between daylight and dark, and it was hard to see; that the shoulder from the top of the incline on the east to the scene of the accident was from 10 to 12 feet wide and uniform in width; that he had previously driven a truck; and that

the shoulder from the top of the incline on the east to the scene of the accident was wide enough on which to drive the Herman oil transport. The shoulder was level, and was wet. He did not see any flares near the scene of the accident, and no lights other than the waving flashlight.

An accountant for the Goodyear Tire and Rubber Company testified that when he left home approximately 3 miles west of Ashland about 6:30 a. m., it was almost completely dark and he had the lights burning on his car. When he was approximately on the bridge at the bottom of the slope going west he saw a red light waving, and as he came closer to the accident he saw a man waving a flashlight. He slowed down, and he saw no flare on the right edge of the pavement at a posiiton of 100 feet back of the scene of the accident and no reflector flare in the vicinity of the accident. This was about 6:35 a. m. He was about 50 or 60 yards behind the place of the accident when he first saw the vehicles involved in the accident. There were no lights at the scene of the accident when he pulled around the transport. There was another truck ahead of the transport. It had its taillights on and reflectors. The person holding the flashlight waved him on.

A carpenter living in Ashland, riding toward Lincoln with another party about 6:30 a. m., testified that they were stopped by a man on the highway and parked their car. He got out of the car and went forward to see if he could be of any assistance. He walked up the right side of the highway along the north edge of the pavement for about 200 feet. He did not see any type of flare along the right edge of the pavement. He ran across the highway from the north to the south and got into the ambulance which was directly across from the Clifton car in the other lane of traffic. It was just starting to get light. He got into the ambulance and looked over the scene of the accident from his seat in the ambulance. He did not see any reflector flare in the vicinity of the

accident. He did not remember any fog, but said it was a "gray morning."

The father-in-law of the deceased, a carpenter employed by the state, testified that he drove from Ashland to his work in Lincoln in his own car. He left home about 7 a. m. It was dark enough to have the lights on his car turned on when he left. The weather was damp. When he got past the bridge at a point about 4 miles west of Ashland, he came upon the accident. He could see the back end of a truck and taillights of cars in front of him. He stopped his car and got out on the running board and waited for traffic to open up. At this point he saw the back end of the transport and very small lights on the transport. He was about 200 feet from the transport. He could not see much of the north edge of the highway, and could not look down the middle of the highway because the truck had it obstructed.

A state safety patrolman testified that the accident was located on U. S. Highway No. 6, about 4 miles west of Ashland and about 1.9 miles east of Greenwood. He was notified of the accident at 6:55 a. m. When he arrived at the scene of the accident about 7:20 a. m., he noticed a car immediately behind the gasoline transport that was parked on the highway, and fixed the location of the parked transport, by virtue of paving station imprint numbers on the concrete, as being 100 feet east of station 721. The accident happened on a slight upgrade looking from the east, and west of a bridge on the highway. He talked to Melia at the scene of the accident. Melia told this witness that he had run out of gas and had stopped on the highway about a quarter till 5 a. m. When this witness arrived there were reflector type flares in place, but he did not know when they were placed in position. He estimated the shoulders at the scene of the accident to be approximately 10 feet wide. The back end of the transport was white with considerable mud or a light covering of dirt on it. To the right

of the highway at the scene of the accident there was a rather shallow ditch. The shoulder was wide enough to drive the transport upon it. The transport was 8 feet wide and there was a clearance of 15 feet 8 inches on the pavement for vehicles to pass around it. The right rear wheel of the transport was 8 inches from the north edge of the pavement. The shoulder of the highway was muddy. He drove his car onto the shoulder of the road. It weighed approximately 3,200 pounds. He tested the shoulder by driving the right front wheel on first, but he had difficulty in getting his car off of the shoulder onto the highway when he left. He saw no skid marks behind the Clifton car.

Don Wilson, the driver who was with Melia, corroborated Melia's testimony. He further testified that he obtained a ride with a truck driver to endeavor to get gasoline. He first went to Greenwood, about 2 miles from the scene of the accident. There was a filling station in Greenwood but it was not open. He then decided to go to Waverly. There was a filling station there but it was not open. The only remaining thing for him to do was to go to Lincoln, and at Jacob's service station, the first filling station on the northeast side of the city, he obtained five gallons of gas. He got a ride in the first car going east with a couple of men who were on their way to Ashland. When he got back to the scene of the accident he observed a Ford car had collided with the transport directly behind the trailer. The ambulance came shortly after he returned. All of the lights on the truck except the headlights were burning when he left and they were the same when he returned. The flares were still out as they had been placed originally. He was at the scene of the accident 10 or 15 minutes before the ambulance came. He helped remove a passenger who was in the Ford car to the ambulance and then stayed until another ambulance arrived. He helped remove the other man from the car and went with the ambulance to the hospital. He notified the Herman Oil

Company of the accident and returned to the scene of the accident with the ambulance driver. The state safety patrolman was there the second time he returned.

The passenger in the Clifton car, Thomas Fick, died as a result of the accident.

The foregoing is a general résumé of the evidence sufficient to a determination of this appeal.

At the close of the plaintiff's testimony and at the close of all the testimony, the defendants Melia and Herman Oil Transport Company moved the court to discharge the jury and enter judgment in favor of them, or direct a verdict in favor of these defendants, which motions were overruled.

The defendants Herman Oil Transport Company and Melia, hereinafter referred to as appellants, assign the following as error: The trial court erred in advising the jury that the plaintiff claimed that the defendants Herman Oil Transport Company and Melia were negligent (a) in failing to use ordinary care to replenish the fuel supply for the oil transport and remove it from the highway after it had stalled thereon; (b) in parking or leaving the oil transport standing on the paved portion of the highway without sufficient reason, when plaintiff says it was practicable to park it off the paved and main-traveled portion of the highway; (c) in failing to put out flares to warn travelers upon bringing the truck to a stop; and (d) in failing to give adequate warning to travelers.

Before taking up the foregoing assignments of error, we cite the following authorities as being applicable.

A motion for directed verdict or its equivalent, or for judgment notwithstanding the verdict, must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and such party is entitled to have every controverted fact resolved in his favor and have the benefit of every inference that can reasonably be

deduced from the evidence. See Peake v. Omaha Cold Storage Co., 158 Neb. 676, 64 N. W. 2d 470.

In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551.

With the foregoing authorities in mind we proceed to a determination of the above assignments of error.

The appellants requested the court to withdraw the issue in assignment of error (a) from the jury, which the court refused to do.

In Plumb v. Burnham, 151 Neb. 129, 36 N. W. 2d 612, we said: "The mere stalling of a motor vehicle temporarily upon the highway, caused by an exhaustion of the gas supply, would not ipso facto constitute negligence as a matter of law, * * *."

We will not repeat the evidence with reference to this assignment of error except to say that Wilson obtained a ride about 5:20 a. m., for the purpose of procuring gasoline to replenish the gas supply of the transport, and returned shortly after 6:30 a. m. There is no evidence that he could have obtained gas at any other gas station, nor is there evidence that Melia would have been able to obtain gas from any of the trucks that stopped at the scene of the accident. He was not obligated to break the seal on the cargo tank, as to do so would have been in violation of the law. We think the evidence shows that the witness Wilson did what any reasonable, prudent person would ordinarily have done under the circumstances and nothing that a person would not have done. We find, as a matter of law, that there is no evidence of conduct on the part of the witness Wilson on which a jury could have found that he was negligent, and the trial court committed prejudicial

error in submitting the above issue to the jury.

With reference to assignment of error (b) above, the appellants requested the trial court to remove this issue from the consideration of the jury which the trial court declined to do.

Section 39-757, R. R. S. 1943, provides in part: "No person shall park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled portion of any highway, outside of a business or residence district, when it is practicable to park or leave such vehicle standing off the paved or improved or main traveled portion of such highway; * * *."

In the instant case the trial court instructed the jury in substance as follows: After defendant Melia realized the transport was stalled, it became his duty to exercise ordinary care to avoid, as much as circumstances would reasonably permit, stopping upon the paved or main or traveled portion of the highway, and if reasonably possible, the blocking of either traffic lane in a manner that would create a traffic hazard. However, if the conditions were such that it would appear to a reasonably prudent person that it was impracticable to drive the transport off the paved portion of the highway, then the defendant Melia would not be negligent for stopping where he did.

We believe the evidence shows that while the shoulder of the highway was wide enough to have accommodated the transport by parking thereon it was covered with 6 inches of clay underneath which was a light-colored soil; that it was wet and muddy; that the patrolman had difficulty, because it was soft and muddy, in getting his 3,200 pound vehicle off the shoulder after he had parked thereon; and that no person who came upon the scene of the accident, with the exception of the patrolman, parked off the paved portion of the highway. Because of the condition of the shoulder of the highway it would have been impracticable to endeavor to park the transport which weighed 57,403 pounds thereon.

We think the evidence shows that Melia did what any reasonable, prudent person would ordinarily have done under the circumstances and nothing that a person would not have done. We find, as a matter of law, there is no evidence of conduct on the part of the appellant Melia upon which a jury could have found that he was negligent, and the trial court committed prejudicial error.

With reference to assignment of error (c) above, which issue was presented to the jury and the appellants requested the same to be withdrawn from the consideration of the jury, it is the appellants' contention that the affirmative evidence shows that nine witnesses, seven of whom were completely disinterested, testified that they saw flares around the stalled transport immediately before or immediately after the collision and that the negative evidence of the appellee's father and four other witnesses who testified they did not see the flares, did not create a fact question for the jury for the reason that these witnesses did not arrive at the scene of the accident until some time after the collision.

We believe that the appellants, in their argument, fail to make the vital distinction between testimony which is negative in form and that which is negative in character. Evidence is positive in character where the witness states that a certain thing did or did not happen to exist, and negative in character where the witness states that he did not see or know of the happening or existence of a circumstance or fact. See, 31 C. J. S., Evidence, § 2, p. 506; In re Estate of Woodward, 147 Neb. 270, 23 N. W. 2d 75; 32 C. J. S., Evidence, § 1037, p. 1079.

In the instant case there was testimony on the part of the appellee by four witnesses, which was in opposition to the testimony of witnesses of the appellants, that they looked and saw no flares. We make reference to the testimony heretofore set out. The court instructed with reference to the duties required in setting out flares, the distance that the same should be set out, and other duties governing such a situation. There is evidence to

the effect that the flares may not have been properly set out as required by the laws of this state. We believe it is within the province of the jury to believe or disbelieve the various witnesses on this subject and to resolve this conflict in the evidence, and that the trial court did not err as contended for by the appellants.

With reference to assignment of error (d) above, the trial court submitted such issue to the jury and the appellants requested the same to be withdrawn from the consideration of the jury, it is the appellants' contention that the testimony disclosed that every witness passing the stalled transport truck prior to the collision, first noticed the lights blinking.

The trial court instructed the jury that the evidence was insufficient as a matter of law to prove that the transport truck was not equipped with lighted clearance and taillights, and that the jury could not find them negligent in that respect.

The appellants further contend that the weight of the evidence established that three reflector flares were properly placed around the transport at the time of the collision. We have previously determined the question with reference to the flares.

It is the appellants' further contention that in view of the settled rule, it was reversible error for the trial court to include in its instructions allegations of fact found in the pleadings which had not been supported by the evidence, citing Allen v. Clark, 148 Neb. 627, 28 N. W. 2d 439, and McClelland v. Interstate Transit Lines, 139 Neb. 146, 296 N. W. 757.

We believe there is evidence to the effect that there might have been inadequacy of the warning to travelers as to whether or not lights on the truck, when blinked, were adequate and sufficient warning, and whether or not the lights were dirty so that they did not reflect a sufficient distance back. Under the circumstances as appear by the evidence, the trial court did not err in submitting this issue to the jury.

The appellants predicate error on the part of the trial court in instructing the jury as appears in instruction No. 11 as follows: "In addition to said statutory requirements, it was also the duty of the defendant Melia to obey the following rules of conduct: It was his duty to exercise ordinary care under the circumstances, commensurate with dangers reasonable to be anticipated, and to avoid an accident, if possible."

The appellants further contend that by this instruction the trial court advised the jury that Melia had two duties: (1) To exercise ordinary care, and (2) to avoid an accident if possible; that since the duties are set out in separate and independent clauses joined by the conjunction "and", it is clear that the first duty did not in any way modify or delimit the second duty, and it is also clear that the instruction left the jury free to find Melia negligent for failing to comply with the second duty even though he had fully complied with the first.

We believe that 60 C. J. S., Motor Vehicles, § 247, p. 604, is applicable: "The operator of an automobile, * * * is not an insurer against injury to persons or property; his duty in the absence of a statute providing otherwise is merely to exercise reasonable or ordinary care, that is, the degree of care and caution which an ordinarily prudent person would exercise under similar circumstances. Ordinary prudence requires a driver to seek to avoid a likely or threatened collision, even though this may involve waiver of his right of way, and the danger may have arisen through another's fault."

This instruction indicates that it was the duty of the appellant Melia to avoid a collision under all circumstances. He was not required to have such complete control of the truck as could prevent a collision by anticipation of negligence or illegel disregard of traffic regulations, and this instruction on this issue placed too great a duty upon the appellant. See Ficke v. Gibson, 153 Neb. 478, 45 N. W. 2d 436.

In the instant case the trial court committed prejudi-

cial error, and this error is not cured by considering all of the instructions as a whole to determine whether or not they properly and fairly present the issues. We conclude that the trial court committed prejudicial error in the giving of this part of the instruction.

The appellants contend the trial court erred in rejecting certain testimony of the defendant Clifton with reference to a conversation alleged to have been had with the decedent about decedent's conduct prior to and at the time of the accident. The trial court sustained objections that such testimony was in violation of section 25-1202, R. R. S. 1943, commonly referred to as the "dead man's statute." In the present state of the record, the trial court did not err as contended for by the appellants.

The appellants contend that the trial court erred in overruling their motion for directed verdict at the conclusion of the appellee's case, which motion was renewed at the conclusion of all of the evidence of the parties, for the reason that the evidence conclusively established that the sole and proximate cause of the collision was the negligence of the defendant Clifton.

From the evidence adduced, we do not believe that this case comes within the rule announced in Roth v. Blomquist, 117 Neb. 444, 220 N. W. 572, 58 A. L. R. 1473, as follows: "As a general rule it is negligence as a matter of law for a motorist to drive an automobile so fast on a highway at night that he cannot stop in time to avoid a collision with an object within the area lighted by his lamps."

We believe there is evidence appearing in the record sufficient to bring this case within the rule announced in Haight v. Nelson, 157 Neb. 341, 59 N. W. 2d 576: " "* * * we have made exception to this general rule when the nature of the object or its condition, such as color, dirt, et cetera, in relation to the highway or road, affected its immediate visibility or when, * * * the driver's attention is distracted or his vision impaired

and his opportunity for immediate discernment thereby affected. In such cases we have held that the issue of the driver's negligence, if any, and the degree thereof is for the jury.'" In the present state of the record a jury question is presented on this issue.

There are other assignments of error which, in the light of our conclusions, need not be discussed.

For the reasons given in this opinion the judgment entered on the verdict is reversed and the cause remanded for new trial.

REVERSED AND REMANDED.