TIMOTHY C. MCFADDEN, APPELLANT, V. WINTERS AND MERCHANT, INC., A NEBRASKA CORPORATION, AND NEBRASKA PUBLIC POWER DISTRICT, APPELLEES.

603 N.W.2d 31

Filed December 7, 1999.   No. A-98-1025.

M.J. Bruckner, of The Bruckner/Ballew Law Firm, P.C., for appellant.

Dan H. Ketcham and John J. Jedlicka, of Hansen, Engles & Locher, P.C., for appellees.

HANNON, MUES, and INBODY, Judges.

INBODY, Judge.

## I. INTRODUCTION

This case involves a suit for personal injuries sustained by Timothy C. McFadden when the 1979 Ford pickup he was driving collided with the rear end of a large cylindrical trailer owned by Winters and Merchant, Inc. (Winters). The trailer had been left by Winters in the northbound lane of a 20-foot-wide private road owned by the Nebraska Public Power District (NPPD), which had been designated by NPPD as the route for all employees to use to enter the Hallam, Nebraska, powerplant on September 20, 1993. The action was tried to a jury which

returned a verdict for Winters. McFadden appeals, assigning various errors which he alleges occurred at trial.

## II. STATEMENT OF FACTS

In 1993, McFadden, age 35, was employed as a maintenance mechanic at the NPPD powerplant at Hallam. His shift ran from 6 a.m. to 4:30 p.m., Monday through Friday.

On Friday, September 17, 1993, all employees of the Hallam plant were notified pursuant to a bulletin that the main entrance to the plant, located at the southwest corner of the property, would be closed for resurfacing from Friday night through the following Monday. The bulletin advised employees that when they came to the plant on Monday morning, they would be required to enter the plant through the entrance on the southeast perimeter of the property. McFadden knew from the instructions given on Friday that he was required to take that road into the plant and that this road would be the only way to enter the plant.

On Monday, September 20, 1993, at approximately 5:45 a.m., McFadden was driving his pickup to work at the Hallam plant. At this time of the morning, in McFadden's words, it was "pitch black" out. The headlights on McFadden's pickup were in good working order and were turned on high beam. McFadden was wearing his seatbelt.

After turning left onto the east-west county road immediately south of the plant that led to the plant's main gate, McFadden turned north toward the plant on an old dirt road covered with bottom ash, which is unburnt coal. The bottom-ash road then intersects with a cement curbed road located immediately south of the perimeter fence of the plant. This road runs generally east, until it reaches the southeast corner of the plant and then curves to the northeast, and then eventually straightens out at a gate. After passing through the gate, the northbound road is straight and downhill toward the plant.

As McFadden entered the curve south of the perimeter fence, he was traveling in the northbound lane at 20 to 25 miles per hour. Approximately 30 yards from the gate, McFadden observed fog or condensation from the plant. As McFadden approached the two swinging gates, he observed that the east gate was closed over the northbound lane, so he had to use the

southbound lane in order to bypass the partially closed gate. Two sets of 1,000-watt lights, 50 feet high, located over the railroad tracks approximately 714 feet north of the gate, shone directly south, complicating McFadden's vision.

As McFadden approached and passed through the gate, he slowed down to 15 to 20 miles per hour. After he passed through the gate, the combination of fog and dust in the air caused total darkness except for the light from the headlights on his pickup, allowing him to see 15 to 20 feet in front of the pickup. After McFadden passed through the gate, he increased his speed to 20 to 25 miles per hour and maneuvered his pickup back into the northbound lane. It was at this point that he first saw the outline of some cylindrical object in the northbound lane. McFadden estimated that he was two car lengths from the object when he first saw it. Although McFadden grabbed the steering wheel and started to swerve left, the right front fender of McFadden's pickup collided with the left rear of the object.

The object that McFadden's pickup struck was a white or gray cylindrical trailer owned by Winters, who was contracted by NPPD to clean its precipitators, which are pollution control devices that remove particulate from the flue gas. The process is designed to maintain clean stack emission. The impact from the collision caused personal injuries to McFadden and property damage to his pickup.

McFadden testified at trial that "[t]here was no warning. The trailer was dusty, it was dirty, and the fog was there and I hit it." McFadden further testified that his headlights shone on the trailer "[j]ust momentarily before I hit it" and that "[t]he main reason why I couldn't see that trailer was because it wasn't marked." The trailer had no orange cones behind it, no reflectors, and no flares.

David Schores, who was following McFadden in his own vehicle, was the only other eyewitness to the accident. He testified at trial that at the time of McFadden's accident, "[t]he sun hadn't come up yet, it was fairly dark, it was completely dark, and the roads were dusty from the earlier shift leaving, and there was moisture in the air, so the dust was kind of — was hanging in the air." Schores believed the fog was caused by moisture coming off the plant's cooling towers which were located at the

north end of the plant. The fog limited Schores' ability to see in front of him.

Schores testified that

> as we were going down the road, all I could see, from two and a half to three car lengths, was [McFadden's] taillights go up in the air, and I proceeded behind him until I got within another car length and then I realized there was something in the road then, but until that point vision was very obstructed.

It was not until Schores stopped his vehicle, got out and started walking toward McFadden's truck that he could see that the object in the road was a trailer. Schores testified that all he could determine was that there was a gray, dusty, dirty, cylindrical object in the road until he got really close to it. The trailer was so dirty that Schores could not make out the trailer's license plates or taillights.

McFadden filed a petition in Lancaster County District Court alleging that Winters was negligent in leaving the trailer in the road and in failing to provide any warning of the existence of the trailer in the road and that such negligence was the proximate cause of serious personal injuries to McFadden. Winters filed an answer denying negligence and asserting that McFadden was contributorily negligent.

A jury trial was held on August 17 through 21, and 24, 1998. In addition to the facts set forth above, McFadden introduced testimony by Roger Koch, who was the maintenance manager at the plant on the date of the accident. Koch testified that he received first-hand and second-hand reports that other people had come close to hitting the trailer that morning and that when Koch investigated the accident that morning, there were no warning devices, including orange cones, around the trailer. Further, Koch testified that although Winters had permission to park its trailer in that location in the past, Winters had not received permission to park the trailer there on this particular occasion. Following the close of McFadden's evidence, Winters moved for a directed verdict based upon the applicability of the range of vision rule. This motion was overruled by the trial court. Winters then presented its defense.

Among the witnesses called by Winters was Ted T. Sokol, a civil engineer and a professor in the College of Engineering and Technology at the University of Nebraska. Sokol testified that on October 17, 1996, at approximately 6 a.m., he visited the NPPD plant for the purpose of conducting some visibility tests in the same timeframe that McFadden's accident occurred and to photograph his observations. At this point in time, it was still dark, and Sokol testified that 6:23 a.m. on October 17, 1996, was comparable to 5:55 a.m. on September 20, 1993. Thus, Sokol testified that by taking the pictures at that time on October 17, 1996, he was getting the same degree of natural lighting before sunrise as was present at the time of the accident.

Sokol took two series of pictures from inside his Suburban vehicle with the lights of the Suburban on low beam. The first series of pictures (exhibits 85, 86, 87, 93, and 94) were of a trailer parked in the southbound lane. The trailer photographed by Sokol was a box-type trailer with an aluminum back, whereas the Winters' trailer was a white cylindrical trailer. With regard to the pictures Sokol took of the trailer, the trailer was parked in the southbound lane, the trailer was shiny, and there was a presence of light to the south of the trailer, which Sokol was not even certain existed at the time of the accident. Despite this, Sokol testified that "[i]n terms of reflectability, [the trailers] were probably fairly comparable." Further, Sokol testified that these pictures were taken for demonstrative purposes, or in other words, to show what Sokol saw on the morning of October 17, 1996. The pictures of the different trailer (exhibits 85, 86, 87, 93, and 94) were received into evidence for demonstrative purposes, over objection by McFadden.

The second series of pictures (exhibits 88, 89, 90, and 91) taken by Sokol are of a cardboard box which was placed in the roadway in the northbound traffic lane where the trailer involved in the accident had been parked. Sokol took the pictures from his Suburban, which was in the northbound lane located to the south of the cardboard box. These pictures were received into evidence over McFadden's foundational objection. Winters did not limit the purpose for which this evidence was offered.

Following the close of all the evidence, Winters renewed its motion for a directed verdict on McFadden's liability, which was

granted by the trial court, and in instruction No. 2 the jury was instructed that

> the Court has determined, as a matter of law, that [McFadden] was negligent in driving his motor vehicle on the access road in such a manner that he was unable to stop or turn aside in time to avoid a collision with [Winter's] trailer which was within his range of vision, and that such negligence of [McFadden] was a proximate cause of his own injury and damage.

McFadden objected to this instruction, which objection was overruled by the trial court. On August 25, 1998, the jury returned a verdict for Winters. McFadden timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

On appeal, McFadden's assigned errors can be consolidated into the following issues: (1) The trial court erred in finding as a matter of law, and in instructing the jury, that McFadden

> was negligent in driving his motor vehicle on the access road in such a manner that he was unable to stop or turn aside in time to avoid a collision with the defendant's trailer which was parked within the range of his vision, and that such negligence of plaintiff was a proximate cause of his own injury and damage;

(2) the trial court erred in allowing into evidence exhibits 85, 86, 87, 93, and 94 (photographs of a different trailer located at the accident scene taken by Sokol 3 years after the accident) and exhibits 88, 89, 90, and 91 (photographs of a cardboard box at the accident scene taken by Sokol 3 years after the accident); (3) the trial court erred in failing to instruct the jury with additional explanatory instructions regarding its ruling that McFadden was negligent in failing to stop or turn aside from an object within his range of vision; and (4) the trial court erred in overruling McFadden's motion to strike testimony by defense expert witness Sokol.

### IV. DISCUSSION

#### 1. RANGE OF VISION

First, we address McFadden's claim that the trial court erred in finding as a matter of law, and in instructing the jury, that McFadden

was negligent in driving his motor vehicle on the access road in such a manner that he was unable to stop or turn aside in time to avoid a collision with [Winter's] trailer which was within his range of vision, and that such negligence of [McFadden] was a proximate cause of his own injury and damage.

McFadden contends that the trial court's granting of Winters' motion for directed verdict on the issue of McFadden's negligence was erroneous and that the issue should have been submitted to the jury.

Winters argues that a directed verdict should have been granted in favor of Winters on the issue of Winters' liability. However, Winters did not cross-appeal, and thus, this issue is not before this court. Furthermore, Winters' arguments regarding Winters' lack of duty toward McFadden due to the accident occurring on NPPD's private property may be relevant to whether or not Winters was entitled to a directed verdict on the ground that Winters owed no duty to McFadden, but this claim is not relevant to the issue of whether or not McFadden was negligent as a matter of law. Thus, we proceed to consider McFadden's assigned error regarding the verdict regarding McFadden's negligence which was directed in favor of Winters.

A directed verdict is proper at the close of all the evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. The party against whom a verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Martin v. Roth*, 252 Neb. 969, 568 N.W.2d 553 (1997). The question presented in the instant case is whether reasonable minds cannot differ that the instant case falls within the range of vision rule.

The range of vision rule provides that negligence generally arises as a matter of law if one operates a motor vehicle on a public street or highway and, on account of the manner of operation, is unable to stop the vehicle or turn it aside without

colliding with an object or obstruction on the street or highway within the operator's range of vision. *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998); *Martin, supra*; *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996); *Converse v. Morse*, 232 Neb. 925, 442 N.W.2d 872 (1989); *Kasper v. Carlson*, 232 Neb. 170, 440 N.W.2d 195 (1989); *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988). The range of vision rule is applicable, notwithstanding that a motorist's vision is impaired by atmospheric or weather conditions, such as falling or blowing snow, rain, mist, fog, or sunlight. *Tapp, supra*; *Mantz v. Continental Western Ins. Co.*, 228 Neb. 447, 422 N.W.2d 797 (1988); *Prime Inc., supra*. These factors are merely conditions which require motorists to exercise a degree of care commensurate with the attendant circumstances. *Tapp, supra*.

■ However, there are exceptions to the range of vision rule. One exception known as the sudden stop rule, which is not applicable to the instant case, is that a following driver need not anticipate that a motorist will suddenly stop or slow on a roadway. *Martin, supra*.

■ Another exception to the range of vision rule exists when a motorist, otherwise exercising reasonable care, does not see an object or obstruction sufficiently in advance to avoid colliding with it because it is similar in color to the road surface and relatively indiscernible. *Id.*; *Traphagan, supra*. Thus, for the "indiscernible object" exception to the range of vision rule to apply, it is essential that the motorist could not have seen the object in time to avoid colliding with it. See *German v. Swanson*, 250 Neb. 690, 553 N.W.2d 724 (1996).

The cases applying the "indiscernible object" exception to the range of vision rule often involve a nighttime collision with a stationary unlighted vehicle similar in color to the roadway. See, e.g., *Horst v. Johnson*, 237 Neb. 155, 465 N.W.2d 461 (1991); *Converse, supra* (nighttime collision; dark-colored stalled vehicle on unlighted county road; driver of stalled vehicle turned off headlights to aid in restarting car, turned on headlights moments before collision); *McClellen v. Dobberstein*, 189 Neb. 669, 204 N.W.2d 559 (1973) (nighttime collision; unlighted garbage truck covered with tar, gravel, and dirt; no warning devices;

parked on unlighted roadway); *Bartosh v. Schlautman*, 181 Neb. 130, 147 N.W.2d 492 (1966) (exception applied where color of struck vehicle was similar to color of highway surface causing vehicle to blend in and rendering vehicle not visible in time to avoid); *Haight v. Nelson*, 157 Neb. 341, 59 N.W.2d 576 (1953) (mud-spattered and unlighted dark-colored car stalled at night on highway with oil mat surface); *Monasmith v. Cosden Oil Co.*, 124 Neb. 327, 246 N.W. 623 (1933) (nighttime collision; unlighted car with color similar to gravel surface; parked on road); *Giles v. Welsh*, 122 Neb. 164, 239 N.W. 813 (1931). See, also, *Fick v. Herman*, 159 Neb. 758, 68 N.W.2d 622 (1955) (wherein "indiscernible object" exception applied to collision with stationary lighted truck but truck was so dirty that lights, though lit, might not have been so noticeable as to disallow application of exception to range of vision rule).

In *Horst, supra*, the driver of a pickup truck (Horst) sued the driver of an automobile (Johnson) for damages resulting from a nighttime rear-end collision in which Johnson's automobile struck Horst's truck. All negligence issues were submitted to the jury. Following a jury verdict for Johnson, Horst appealed, alleging, inter alia, that the district court erred in failing to grant his motion for directed verdict regarding Johnson's liability.

The Nebraska Supreme Court determined that the trial court properly denied Horst's motion for directed verdict because there was conflicting evidence on whether the exterior lights on Horst's truck were illuminated and that, at night, the dark green color of Horst's truck was similar to the color of the newly paved road. This created a factual question as to whether the truck was virtually indiscernible and thus whether the exception to the range of vision rule should apply. Consequently, the issue was properly submitted to the jury.

In the instant case, there was evidence presented that the accident occurred shortly before 6 a.m. and that the conditions were dark and foggy. Winters' white or gray cylindrical trailer was parked in the northbound lane of the road. The trailer was so dirty that Schores, the only eyewitness to the accident other than McFadden, could not make out the trailer's license plates or taillights. Schores testified that all he could determine was that there was a gray, dusty, dirty, cylindrical object in the road until

he got really close to it. Additionally, there was evidence that there were no flares, flags, flashers, or other warning devices on the road to indicate the presence of the parked trailer. Further, McFadden testified that his headlights shone on the trailer "[j]ust momentarily before I hit it" and that "[t]here was no warning." Finally, there was evidence that other people had come close to hitting the trailer on the morning of McFadden's accident.

Thus, in the instant case, there was a factual question presented as to whether the trailer was virtually indiscernible, and, consequently, there was a question presented as to whether the facts of this case fall within the exception to the range of vision rule. Accordingly, the directed verdict regarding McFadden's negligence was erroneous; this question should have been submitted to the jury, and this cause must be reversed and the matter remanded for a new trial. Furthermore, for purposes of completeness, we note that although neither party raises the issue, the jury should be instructed that it is to determine whether the defendant is negligent before considering the defenses claimed by the defendant. See NJI2d Civ. 2.01.

■ Although we have determined that this judgment must be reversed and the cause remanded for a new trial, we proceed to address McFadden's assignment of error regarding the admission of photographs into evidence. "If an issue is likely to recur upon remand, an appellate court may discuss it, even though it is not dispositive of the appeal." *State v. Engleman*, 5 Neb. App. 485, 492, 560 N.W.2d 851, 857 (1997). See, *State v. Richter*, 225 Neb. 837, 408 N.W.2d 717 (1987); *Crowder v. Aurora Co-op. Elev. Co.*, 223 Neb. 704, 393 N.W.2d 250 (1986).

### 2. ERRONEOUS ADMISSION OF EXHIBITS

Next, McFadden contends that the trial court erred in admitting into evidence exhibits 85 through 91, 93, and 94 which prejudiced his right to a fair trial. Exhibits 85, 86, 87, 93, and 94 are photographs of a different trailer located at the accident scene which were taken by Sokol 3 years after the accident. Exhibits 88, 89, 90, and 91 are photographs of a cardboard box at the accident scene taken by Sokol 3 years after the accident. Winters claims that these photographs supplement Sokol's spoken

description of the events on the morning Sokol took the photographs and clarify some issues in the case.

In determining the relevance and admissibility of the demonstrative evidence at issue, our analytical framework is set primarily by the Nebraska Evidence Rules. Generally, all relevant evidence is admissible. Neb. Rev. Stat. § 27-402 (Reissue 1995).

> Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or the evidence tends to establish a fact from which the existence or nonexistence of a fact in issue can be directly inferred. *Washa v. Miller*, 249 Neb. 941, 546 N.W.2d 813 (1996); *Coppi v. West Am. Ins. Co.*, 247 Neb. 1, 524 N.W.2d 804 (1994). See, also, Neb. Rev. Stat. § 27-401 (Reissue 1995).

*Benzel v. Keller Indus.*, 253 Neb. 20, 27, 567 N.W.2d 552, 557 (1997). However, even evidence that is relevant may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Neb. Rev. Stat. § 27-403 (Reissue 1995); *Benzel, supra*; *Paro v. Farm & Ranch Fertilizer*, 243 Neb. 390, 499 N.W.2d 535 (1993).

(a) Photographs Depicting Trailer

First, we address McFadden's claim that the trial court erred in admitting exhibits 85, 86, 87, 93, and 94 into evidence. Exhibits 85, 86, 87, 93, and 94 are nighttime photographs taken by Winters' expert 3 years after the accident of a different trailer than the one involved in the accident, which was parked in the opposite direction of the trailer involved in the accident.

In its offer of the evidence, Winters stated that the exhibits were offered for demonstrative purposes; however, the jury was not given a limiting instruction either at the time the exhibits were admitted into evidence or during the final jury instructions. Although the court was not requested to give a limiting instruction regarding the demonstrative evidence, a trial court, whether requested to do so or not, has a duty to instruct the jury on issues presented by the pleadings and the evidence.

*Nguyen v. Rezac,* 256 Neb. 458, 590 N.W.2d 375 (1999); *Wheeler v. Bagley,* 254 Neb. 232, 575 N.W.2d 616 (1998). Therefore, the trial court erred in failing to give a limiting instruction to the jury regarding this demonstrative evidence. Because we have ordered this cause remanded for a new trial, we address whether these exhibits are admissible for purposes of the retrial.

> [D]emonstrative exhibits are admissible if they supplement the witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial. . . .
>
> Demonstrative exhibits are inadmissible when they do not illustrate or make clearer some issue in the case; that is, where they are irrelevant, or where the exhibit's character is such that its probative value is substantially outweighed by the danger of unfair prejudice.

*Benzel,* 253 Neb. at 28, 567 N.W.2d at 558. The admission of demonstrative evidence is within the discretion of the trial court, and a judgment will not be reversed on account of the admission or rejection of such evidence unless there has been a clear abuse of discretion. *Benzel, supra.* See *Kudlacek v. Fiat S.p.A.,* 244 Neb. 822, 509 N.W.2d 603 (1994).

In *Kudlacek,* the defendant offered into evidence edited videotapes of various performance tests conducted on a Fiat X1/9 automobile, the subject vehicle of the litigation, as well as performance tests conducted on other vehicles. The plaintiff objected, but only as to the videotapes showing the vehicles other than the Fiat X1/9. The Nebraska Supreme Court concluded that the trial court did not abuse its discretion in admitting the demonstrative evidence because the videotapes were not meant to re-create the accident, but were offered to rebut the plaintiff's claim that the Fiat X1/9 handled differently from other cars in normal maneuvers at a particular speed.

More recently, in *Benzel, supra,* the plaintiff brought a product liability suit against a ladder manufacturer after a step on the ladder upon which he was standing failed causing the plaintiff to fall resulting in a broken leg. At trial, the plaintiff used exemplar ladders to supplement his expert witness' testimony regarding design and manufacturing defects in the ladders. The jury

returned a verdict for the plaintiff and the defendant, Keller Industries, Inc., appealed, arguing, inter alia, that the trial court erred in allowing the plaintiff's expert to testify concerning the unused exemplar ladders as demonstrative evidence. The Nebraska Supreme Court held:

> Thus, the record establishes that Keller caused to be placed at issue whether the step-to-side-rail gaps, which Benzel contends caused the rivet failure, resulted from abuse or misuse, or whether these gaps were manufacturing defects. Under such circumstances, we cannot conclude that the trial court abused its discretion in receiving into evidence the unused exemplar ladders when Benzel's engineering expert utilized the unused ladders to demonstrate excessive step-to-side-rail gaps. The demonstrative exhibits supplemented the expert's spoken description of the cause of the rivet failure and aided in clarifying a crucial issue at trial. As an integral part of our determination, we reject Keller's contention that the probative value of the demonstrative exhibits is substantially outweighed by the danger of unfair prejudice.

*Benzel v. Keller Indus.*, 253 Neb. 20, 30, 567 N.W.2d 552, 559 (1997).

With regard to the pictures Sokol took of the trailer, the trailer was parked southbound (not northbound like the trailer at the time of the accident), the trailer was shiny (not dirty like the trailer in the accident), and there was the presence of light to the south of the trailer, which Sokol was not even certain existed at the time of the accident. These pictures are irrelevant in that they do not illustrate or make clearer some issue in the cause. Further, the pictures were misleading to the jury. Thus, exhibits 85, 86, 87, 93, and 94 are not admissible at the retrial in this cause.

### (b) Photographs Depicting Cardboard Box

Next, we address McFadden's claim that the trial court erred in admitting exhibits 88, 89, 90, and 91 into evidence. Exhibits 88, 89, 90, and 91 are nighttime photographs taken by Winters' expert 3 years after the accident of a cardboard box placed in the roadway in the northbound traffic lane where the trailer involved in the accident had been parked.

These exhibits serve to supplement Sokol's spoken description of the events on the morning he took the pictures. Thus, upon retrial, Sokol's photographs depicting the cardboard box are admissible for demonstrative purposes provided proper foundation can be laid. Further, if said evidence is admitted by the court, the jury must be instructed regarding the admissibility of this evidence for a limited purpose. See NJI2d Civ. 1.72.

We need not address McFadden's remaining assignments of error (Nos. 3 and 4), because such analysis is not necessary for disposition of this case, see *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994), and these issues are unlikely to arise again at retrial.

## V. CONCLUSION

The district court erred in granting Winters' motion for directed verdict regarding McFadden's negligence and in so instructing the jury. Further, the court erred in allowing into evidence exhibits 85 through 91, 93, and 94. Thus, this judgment must be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.